**Rodney ROBERTSON, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

Supreme Court of Delaware.

Submitted: Nov. 21, 1990.
Decided: July 31, 1991.

Joseph A. Hurley (argued), Wilmington, for appellant.

Fred S. Silverman, Chief Deputy Atty. Gen., and Timothy J. Donovan, Jr., Deputy Atty. Gen. (argued), Wilmington, for appellee.

Before CHRISTIE, C.J., HORSEY and HOLLAND, JJ.

HORSEY, Justice:

Defendant, Rodney Robertson, was convicted in a jury trial in Superior Court of Trafficking in Cocaine (16 *Del.C.* § 4753A) and Possession of Cocaine (16 *Del.C.* § 4754), the lesser included offense of the charge of Possession with Intent to Deliver Cocaine (16 *Del.C.* § 4751). *See* 16 *Del.C.* § 4762. Defendant was sentenced to a term of five years' incarceration on the trafficking conviction, of which the first three years were mandatory. Defendant was also fined $50,000, which was suspended, and given a suspended sentence of one year's incarceration on the possession charge. Defendant's appeal raises four issues: (1) whether the detention and search of the defendant and subsequent seizure of evidence violated defendant's Fourth Amendment rights; (2) whether the trial court's instructions adequately explained to the jury the elements of the offense of trafficking in cocaine; (3) whether there was sufficient evidence to support the convictions; and (4) whether the State's repeated oblique references to defendant's failure to testify constituted plain error, in violation of defendant's Fifth Amendment rights. We find no merit in the first three issues raised by defendant on appeal. However, we find that the prosecutor's remarks constituted impermissible comments on defendant's election not to testify, and further that such remarks amount to plain error. Accordingly, we reverse defendant's convictions and remand the case for a new trial.

I

At about 10:00 p.m. on September 1, 1989, a City of Wilmington police officer, on routine patrol in a section of Wilmington known to have a high incidence of drug and alcohol traffic, was attracted by loud music coming from a car parked at the curb of 13th and Wilson Streets. Officer Michael Maggitti observed defendant Robertson sitting in the driver's seat of a Cadillac Eldorado, a "very nice looking car," with a male passenger in the front seat and a third male standing by the partially opened door on the driver's side. Officer Maggitti stopped his cruiser in front of the Cadillac with the intention of telling the occupants to turn the car radio down. As he approached on foot the music subsided, but the officer continued on—his suspicions aroused by the combination of the youthful appearance of the driver and make of the car.

Maggitti asked Robertson who owned the car, and Robertson replied that it belonged to his brother. When Maggitti asked the name of his brother, Robertson

replied that the car was not in his brother's name. Maggitti then ordered Robertson out of the car and frisked him for weapons. At some point, a second police car arrived with patrolmen Brown and Butler. Patrolman Brown had already taken custody of the young man standing at the side of the vehicle, and Patrolman Butler came forward to take charge of the defendant. As Butler approached, he noticed a brown paper bag on the ground under the Cadillac, lying four to six inches in from the driver's side. As Maggitti retrieved the bag, Robertson exclaimed that the bag was not his. The bag contained U.S. currency and foil wrapped packets, typical of illegal drug packaging. Robertson was read his *Miranda* rights. More cash was found in a voluntary search of the car ($90) and on Robertson's person. The paper bag contained $20 cash and 6.01 grams of cocaine.

Defendant did not move to suppress the evidence. The defendant did not testify at trial, nor did he offer any witnesses. In both opening and rebuttal summations, the prosecutor repeatedly characterized the evidence as "undisputed":

1) It is not disputed, at least *there's been no dispute from that witness stand,* no witness has come in to question the state's evidence that on September 1st, 1989, at about ten p.m. the police came upon an automobile containing the defendant; that located, as the police officer described for you, inches from the defendant's hand was a bag that contained over six grams of cocaine.

2) You'll see what [defendant's attorney] says, but I suggest to you for now that there's going to be no real dispute, no basis to dispute anything of what I just said. The defendant was seated in that car, and there was a bag of cocaine right by his hand.

3) *It's undisputed from the witness stand* that the police approached the car and they did not see any kind of movement out of "C" [the person standing outside of the car] along the lines of this or this (demonstrating).

4) Well, we know that the bag was by the defendant's left hand, the hand that would be hanging down by the car. For

A to have gotten the bag there, he would have to have somehow reached all the way, way down under the car and thrown it under. Again, *it's undisputed* that that did not happen.

5) *There is no testimony whatsoever* that the drugs, if they were possessed by him, were possessed by him for his personal use.

6) A, B and C. A is the defendant. He got arrested, as you can see from the evidence, because the drugs were right by his hand. *There's no evidence that came from the witness stand* that those drugs came from B, who was on the other side of the car, or C, who was on the other side of the door. There's no— there's no evidence that came from this witness stand that those drugs were in the street before the defendant arrived. There's no evidence that came from the witness stand that those drugs came from B or C. And the evidence is actually to the contrary, that it did not come from them.

The defendant did not object to any of these statements, nor did the trial court intercede. After the parties' closing statements, as part of the jury charge, the trial judge gave the jury a routine instruction that they were not to draw an inference of guilt from the defendant's failure to testify. The jury found Robertson guilty of Trafficking in and Possession of Cocaine. 16 *Del.C.* §§ 4753A and 4754.

## II

We first address defendant's contention that the seizure and detention of the defendant was illegal, and therefore that all evidence subsequently discovered should be suppressed. Since defendant raises this claim for the first time on appeal, we must apply a plain error standard of review. *Brokenbrough v. State,* Del. Supr., 522 A.2d 851, 856 (1987). Defendant argues that under the totality of the circumstances, Officer Maggitti did not have the "reasonable and articulable suspicion" necessary in order to seize or detain the defendant. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Defen-

dant argues that the officer's observation of a young person in an "older model" Cadillac does not even approach the level of suspicion necessary to justify detaining the defendant, ordering him out of the car, and frisking him for weapons.

In response, the State argues that the officer's questioning of Robertson as to the ownership of the car while Robertson was sitting in a parked car was not a "stop" or "seizure" under the Fourth Amendment. The State further suggests: (1) that the officer had a legitimate reason to approach the car, based on the noise violation; (2) that defendant's contradictory statements of the car's ownership reasonably aroused Officer Maggitti's suspicion that the car might be stolen; and (3) that the officer had reason to detain the defendant based on the defendant's response, his age, the type of car and the fact that the police had been receiving complaints of crime in the area. The State argues that these facts justified a brief *Terry*-type detention to determine the status of the vehicle. Therefore, the police were properly proceeding with an investigatory stop when the bag containing drugs appeared in plain view. Alternatively, the State contends that Robertson did not have standing to challenge the search and seizure, or that Robertson's Fourth Amendment rights were not implicated, even if he did have standing, because society does not recognize a privacy interest in "street trash." Finally, the State contends the search of the car was justified pursuant to defendant's arrest for drug trafficking.

■ The Fourth Amendment protects individuals against unreasonable searches and seizures. The individual's privacy interest is balanced against the public interest in law enforcement. *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357, 361–62 (1979). There is an additional concern for the investigating officer's safety, who must be personally secure to perform his or her duties. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909. "Thus, the permissibility of a particular law-enforcement practice is judged by balancing its intrusion on the individu-

al's Fourth Amendment interests against its promotion of legitimate governmental interests." *Goldsmith v. State*, Del.Supr., 405 A.2d 109, 111 (1979) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667–68 (1979)).

■ For each encounter between a private citizen and a law enforcement agent, the degree of suspicion required varies with the nature of the seizure. *See Coleman v. State*, Del.Supr., 562 A.2d 1171, 1174 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 736, 107 L.Ed.2d 754 (1990). As the stop becomes more invasive, the articulable facts which form the basis of the stop must edge towards probable cause from reasonable suspicion. The minimum level of detention is the brief investigatory stop identified in *Terry*. Since a stop does not rise to the level of an arrest, probable cause is not required. *United States v. Sokolow*, 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989). Of course, a vague hunch or feeling that the defendant "looked suspicious" will not do. *Brown v. Texas*, 443 U.S. at 52, 99 S.Ct. at 2641, 61 L.Ed.2d at 362. The officer must have a "reasonable, articulable suspicion that a crime had just been, was being, or was about to be committed." *Id.* at 51, 99 S.Ct. at 2641, 61 L.Ed.2d at 362. "[I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880, 20 L.Ed.2d at 906; *Downs v. State*, Del.Supr., 570 A.2d 1142, 1145 (1990).

■ The issue before us here is whether Officer Maggitti had formulated a reasonable suspicion, based on the facts as he knew them at the time, to approach Robertson for an investigatory stop. In evaluating the officer's conduct, we consider "the totality of the circumstances." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981). Although we give due deference to an officer's experience and knowledge, the facts which form the basis of the reasonable suspicion must "be capable of measure-

ment against 'an objective standard.'" *Delaware v. Prouse*, 440 U.S. at 654, 99 S.Ct. at 1396, 59 L.Ed.2d at 668 (1979) (footnote omitted).

■ We first examine the reasonableness of the officer's initial approach to defendant's car. The record indicates that Officer Maggitti, on patrol alone in an unmarked car, pulled in front of defendant's parked car to tell the defendant to turn his car radio down in order to comply with a noise abatement ordinance.[1] As Maggitti exited his patrol car, defendant turned his car radio down, but the officer walked up to the car. We cannot agree with Robertson's suggestion that the officer acted unreasonably in not immediately aborting his investigation. There was credible testimony that defendant was in violation of a municipal ordinance. The officer was justified in approaching the car for the violation of the noise ordinance, whether or not the officer may have also suspected that the occupants were engaged in other criminal activity. *United States v. Cummins*, 920 F.2d 498, 500–501 (8th Cir.1990); *see also United States v. Hollman*, 541 F.2d 196 (8th Cir.1976).

■ As the officer approached the vehicle, he felt that it was "odd that this young of a man was driving what appeared to be a very expensive automobile," and thus asked the defendant who owned the car. It is well established that certain police questioning of individuals in parked automobiles does not constitute a Fourth Amendment seizure.[2] *See United States v. Jefferson*, 906 F.2d 346, 349 (8th Cir.1990); *United States v. Pajari*, 715 F.2d 1378, 1381 (8th Cir.1983); *State v. Mennegar*, 114 Wash.2d 304, 787 P.2d 1347 (1990); *State v. Marks*, 226 Kan. 704, 602 P.2d 1344, 1350 (1979). *See also* 3 W. LaFave,

*Search and Seizure*, § 9.2(h) (2d ed. 1987). For Fourth Amendment purposes, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *see also California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). "[T]he police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565, 572 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497, 509 (1980)). Even if Officer Maggitti's initial approach and questioning of defendant constitute a "seizure," we hold that such a limited detainment was justified by defendant's violation of the noise ordinance.

■ The question then becomes whether the further "stop" or detainment after defendant's vague answer to the question concerning ownership of the car was supported by reasonable and articulable suspicion. This determination "'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' *Scott v. United States*, 436 U.S. 128, 136, 56 L.Ed.2d 168, 98 S.Ct. 1717 [1723] (1978), and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783, 86 L.Ed.2d 370, 378 (1985). While the question is a close one, given the totality of the circumstances, we find that such a reasonable, articulable suspicion did exist.

The Supreme Court has recently rearticulated the test to justify a stop or frisk:

---

1. The officer testified as follows: "The music was extremely loud. The City of Wilmington has a noise abatement ordinance that says if you can hear music from over fifty feet away, then you're in violation. And I could hear this music as soon as I turned the corner, which was more like seventy-five or a hundred feet away.... I pulled in front of the parked vehicle, parked Cadillac, and exited my vehicle to

go back and tell the operator he must turn the radio down or he was going to be cited."

2. If no seizure has occurred, not only is there no requirement of probable cause, but the police need not even show the reasonable suspicion required for a *Terry* stop. *See United States v. Adegbite*, 846 F.2d 834, 837 (2d Cir.1988).

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

*Alabama v. White*, —— U.S. ——, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301, 309 (1990). We have likewise held that the quantum of evidence necessary for reasonable suspicion is less than that required for probable cause. *Coleman v. State*, 562 A.2d at 1174.

When Officer Maggitti approached the defendant, he had already observed a "very young looking man"; in fact, the officer suspected that defendant may not have been old enough to drive. The officer also considered the car to be a "very expensive automobile" and in an area in which police "had been getting complaints there of people hanging in this park at night and drinking and using drugs." Hence, the officer's questioning of defendant concerning the car's ownership was appropriate. Since Robertson's responses were contradictory and arguably evasive, we conclude that Officer Maggitti had a reasonable basis for his suspicion that the car was stolen. "These objective facts 'when used by trained law enforcement officers ... can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion.'" *Coleman*, 562 A.2d at 1176 (quoting *United States v. Cortez*, 449 U.S. at 419, 101 S.Ct. at 695–96, 66 L.Ed.2d at 629). *See also Byrd v. State*, Del.Supr., 458 A.2d 23, 25 (1983); *Goldsmith v. State*, 405 A.2d at 112 ("The availability of alcohol in the neighborhood and the officer's experience, together with the officers' observation of defendant's backing into a parked car and abrupt driving off without stopping to check for damage, were sufficient objective criteria to have given the officers an 'articulable and reasonable suspicion' that defendant was intoxicated"); *United States v. Cummins,*

920 F.2d at 502 (police suspicions aroused by inconsistent answers); *People v. Martinez*, 206 Ill.App.3d 813, 151 Ill.Dec. 609, 564 N.E.2d 1271 (1990).

Having determined that the stop was justified, we next address whether the investigatory detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879, 20 L.Ed.2d at 905. In this case, once Officer Maggitti formulated the reasonable suspicion that the car was stolen, he asked defendant to get out of the car and proceeded to pat him down for weapons. Up to this point, Officer Maggitti was the sole officer on the scene. Defendant had a male passenger seated inside the vehicle, and another male was standing on the driver's side of the vehicle. As Maggitti asked defendant to step from the vehicle, a second police car arrived, carrying two officers.

 We must therefore determine whether there was articulable suspicion for the weapons frisk. The *Terry* Court articulated the appropriate test:

[T]here must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. *The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.*

*Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, 20 L.Ed.2d at 909 (emphasis added). In applying this test, we must determine "whether 'the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate.'" *Goldsmith v. State*, 405 A.2d at 113 (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 112, 98 S.Ct. 330, 334, 54 L.Ed.2d 331,

337–38 (1977)). "[I]nvestigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S.Ct. 3469, 3480, 77 L.Ed.2d 1201, 1218 (1983). Once a forced encounter is justified, "the officer's right to take suitable measures for his own safety follow[s] automatically." *Bromwell v. State*, Del.Supr., 427 A.2d 884, 891 (1981) (quoting *Terry*, 392 U.S. at 34, 88 S.Ct. at 1886, 20 L.Ed.2d at 913 (Harlan, J., concurring)).

 Viewing all the circumstances of this case, we conclude that Officer Maggitti was justified in conducting a limited patdown for weapons to insure his safety.[3] The officer was in an area which had been frequently reported for drug activity; he at the moment was alone confronting three individuals; the defendant was seated in a motor vehicle; and the officer suspected that the car was stolen.[4] Given all these facts, we find that the officer reasonably feared for his safety. *See State v. Wausnock*, Del.Supr., 303 A.2d 636 (1973).

 Having found reasonable suspicion for the stop and frisk under the circumstances, we conclude that defendant's remaining arguments for exclusion of evidence must be rejected. After Maggitti ordered defendant out of the car, two other officers arrived. At this point, one of the officers noticed the brown paper bag lying on the ground underneath the Cadillac. The officers had the right to seize this bag since it was in plain view and the officer had the right to be in the position to have the view. *Cf. Harris v. United States*, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d

1067, 1069 (1968); *Wicks v. State*, Del. Supr., 552 A.2d 462, 464–65 (1988); *Miller v. State*, Del.Supr., 310 A.2d 867, 869 (1973). In fact, defendant denied any interest in the bag before it was seized. We further note that defendant's expectation of privacy in the contents of a paper bag laying on the ground is "nominal, at best." *Bromwell*, 427 A.2d at 891. "Indeed, defendant's standing even to challenge the search is dubious." *Id.* (citing *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)). Our finding that defendant did not have a legitimate expectation of privacy in the bag is not inconsistent with his conviction for possession of the contents. *See United States v. Salvucci*, 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 628 (1980) ("We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectancy of privacy in the area searched.").

 Once the contents of the bag were revealed, the officers had probable cause to arrest the defendant for the drug offense. The search of the car and the further search of defendant's person were clearly justified incident to defendant's arrest. *Traylor v. State*, Del.Supr., 458 A.2d 1170, 1174 (1983). *See also New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768, *reh'g denied*, 453 U.S. 950, 102 S.Ct. 26, 69 L.Ed.2d 1036 (1981); *Rawlings v. Kentucky*, 448 U.S. 98, 110–11, 100 S.Ct. 2556, 2564, 65 L.Ed.2d 633, 645–46 (1980). Thus, all evidence seized from the car and defendant's person is admissible.

---

**3.** Officer Maggitti testified:

At this point my suspicion that perhaps this gentleman did not belong with this car was starting to be confirmed. At this point, for my own safety, as I—at this point I was by myself. I asked the defendant to step out of the car so I could pat him down, insure that he did not have any weapons on him. As I was asking Mr. Robertson to step from the vehicle, a second police car pulled up along side of me. Then at that point I patted down Mr. Robertson and he had no weapons.

**4.** Professor LaFave summarizes lower courts' treatment of the degree of suspicion required in order to frisk as follows:

Lower courts have been inclined to view the right to frisk as being 'automatic' whenever the suspect has been stopped upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed, whether the weapon would be used to actually commit the crime, to escape if the scheme went awry, or for protection against the victim or others involved. This includes such suspected offenses as robbery, burglary, rape, assault with weapons, homicide, and dealing in large quantities of narcotics.

3 W. LaFave, *Search and Seizure* § 9.4(a) at 506 (2d ed. 1987) (footnotes omitted).

## III

The second issue Robertson raises on appeal is the adequacy of the jury instructions concerning the elements of trafficking in cocaine. He first argues that the trial court erred in failing to adequately define all elements of trafficking in cocaine. The trial court instructed the jury on the offense of trafficking in cocaine as follows: "Any person who is knowingly in actual or constructive possession of five grams or more of cocaine or of any mixture containing cocaine is guilty of trafficking in cocaine." *See* 16 *Del.C.* § 4753A. According to Robertson, the trial court then defined actual "possession," but not "constructive possession." Defendant believes this omission prejudiced him by allowing the jury to speculate as to the meaning of constructive possession.

Defendant also objects to the trial court's limitation of the knowledge requirement of section 4753A to Robertson's knowledge that the material he possessed was cocaine—meaning that the jury need not find that the defendant knew the cocaine weighed five grams or more. Defendant contends that the knowledge requirement for trafficking includes both the knowledge of possession of contraband *and* its precise weight. 11 *Del.C.* § 252.[5]

■ The State responds that the jury instruction was adequate to inform the jury of the essential elements of the crime. We agree. The trial judge's definition included elements of both actual and constructive possession. As to the defendant's knowledge of the weight of cocaine seized, the State points out that ignorance is a valid defense only if it negates the guilty state of mind.

■ The trial judge adequately defined the elements of possession:

A person who knowingly has direct physical control over a thing at a given time is regarded as being in actual possession of it. A person is generally regarded as being in possession of a controlled substance when it is under the person's dominion and control and to the person's knowledge either is carried on his person or is in his presence and custody or, if not on his person or in his presence, the possession thereof is immediately accessible and exclusive to him.

Possession includes location in or about the defendant's person, premises, belongings, vehicle or otherwise within the person's reasonable control, but a person possesses something wherever it is located only if that person has dominion, control and authority over it.

The second paragraph incorporated the statutory definition of "possession" under the Uniform Controlled Substances Act, 16 *Del.C.* § 4701(28) (1990). An instruction which tracks the statutory language is adequate to inform the jury. *Van Arsdall v. State*, Del.Supr., 486 A.2d 1, 10 (1984), *vacated on other grounds*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). The first paragraph emphasized the essential elements of "dominion and control" over the contraband. *See Potts v. State*, Del.Supr., 458 A.2d 1165, 1167 (1983). "This Court has repeatedly held such 'dominion, control, and authority' as being essential elements of the 'possession' of contraband...." *Holden v. State*, Del.Supr., 305 A.2d 320, 321 (1973) (citations omitted). Therefore, we do not find the instruction to be inadequate.

■ The trier of fact could reasonably have found that the defendant met the statutory definition of possession because the contraband was located "about the defendant's ... vehicle." 16 *Del.C.* § 4701(28). The trafficking statute, section 4753A of the Uniform Controlled Substances Act, prohibits knowing actual or constructive possession of cocaine. However, the Uniform Act does not separately define actual and constructive possession; it has a single definition of possession,

---

5. 11 *Del.C.* § 252 provides:

§ 252. Prescribed state-of-mind requirement applies to all material elements.

When a statute defining an offense prescribes the state of mind that is sufficient for the commission of the offense, without distinguishing among the elements thereof, the provision shall apply to all the elements of the offense, unless a contrary legislative purpose plainly appears.

which appears to combine elements of both actual and constructive possession. Therefore, there was no need for the trial judge to give the Uniform Act's definition of "possession," and then go on to provide his own definition of constructive possession. A further instruction would have been redundant and confusing. *See Scott v. State,* Del.Supr., 521 A.2d 235, 243 (1987).

■ We also reject defendant's argument that the "knowingly" element of the trafficking statute extends to knowledge that the material is the proscribed substance *and* its precise weight. We conclude that the General Assembly intended the *mens rea* to encompass only the substance itself—a knowledge of the amount need not be proven by the State.[6] Thus, "[t]he word 'knowingly,' as used in the statute, modifies only the possession element of the offense and not the quantity." *Way v. State,* Fla.Supr., 475 So.2d 239, 241 (1985) (applying drug trafficking statute similar to 16 *Del.C.* § 4753A).

### IV

■ Defendant's next contention is that the evidence is not sufficient to support a conviction. The standard is whether *any* rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt. *Shipley v. State,* Del. Supr., 570 A.2d 1159, 1170 (1990); *Potts v. State,* 458 A.2d at 1170.

■ Although we note that the State's evidence was not conclusive, it was not such that *no* rational trier of fact could

convict. The defendant was seated in a car parked over a bag of drugs. Once police discovered the bag, defendant quickly disclaimed ownership of the bag before its contents were revealed. This evidence, coupled with the amount of money present in the vehicle and on the defendant's person, could lead a rational jury to believe the State's theory that this was the way defendant conducted his drug business. A jury could believe that given the value of the drugs in the bag and the twenty dollars cash, it was unlikely the bag had been discarded prior to Robertson's arrival. It is true, as defendant argues, there is no direct evidence linking him to the cocaine. The fact that most of the State's evidence was circumstantial is irrelevant; "the Court does not distinguish between direct and circumstantial evidence." *Shipley,* 570 A.2d at 1170.

### V

The defendant's final claim on appeal is that the prosecutor's repeated references to the evidence as "undisputed from the witness stand" violated his Fifth Amendment right not to testify. The State responds that characterization of the evidence as undisputed is constitutionally permissible where that indeed is the case. *See Hughes v. State,* Del.Supr., 437 A.2d 559, 573–74 (1981). The State further suggests that there were witnesses at the scene other than the defendant who could have testified, and any prejudice to the defendant was cured by the trial judge's routine instruction.[7]

---

**6.** The State also calls our attention to a recent amendment to the drug trafficking statute (not effective at the time of Robertson's arrest) clarifying the knowledge element and limiting it to the possession element, not amount of contraband. The synopsis to the proposed amendment stated:

Several court cases are challenging the state of mind required to be proved in a drug trafficking case. This Act clarifies that it was not the intent of the General Assembly to require the State to prove that a defendant knew the weight of the drugs possessed.

The statute now provides, in pertinent part:

(e) In any prosecution under this section the State need not prove that the defendant

had any knowledge as to the weight of the substance possessed. The State need only prove that the defendant knew that the substance was possessed; and, that in fact the substance was that which is alleged and that the substance in fact weighed a certain amount.

16 *Del.C.* § 4753A(e) (Approved July 23, 1990). *See also* 67 *Del.Laws,* c. 427.

**7.** "The failure of a person accused of a crime to testify must not be considered as an indication of his guilt. The defendant has a Constitutional right to testify or not to testify as he chooses. The fact that the defendant did not testify must not be considered by you as an indication that the defendant is guilty of the crimes charged."

■■■■ Defendant raises this claim for the first time on appeal, having made no objections to the comments of the prosecutor's opening and rebuttal summations at trial. As a general rule, a defendant who fails to make a contemporaneous objection to improper statements made in closing argument waives the right to raise the issue on appeal. *Ray v. State*, Del.Supr., 587 A.2d 439, 443 (1991); *Weber v. State*, Del.Supr., 547 A.2d 948, 960 (1988); Supr. Ct.R. 8. Absent plain error, this Court will not review an issue not raised below and fairly presented to the trial court. *Stansbury v. State*, Del.Supr., 591 A.2d 188, 191 (1991); *Probst v. State*, Del.Supr., 547 A.2d 114, 119 (1988). "However, where substantial rights are jeopardized and the fairness of the trial imperiled, this Court will apply a plain error standard of review." *Stansbury*, 591 A.2d at 191. Under this standard,

> the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process. *Dutton v. State*, Del. Supr. 452 A.2d 127, 146 (1982). Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice. *Bromwell v. State*, Del.Supr., 427 A.2d 884, 893 n. 12 (1981).

*Wainwright v. State*, Del.Supr., 504 A.2d 1096, 1100, *cert. denied*, 479 U.S. 869, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986). Applying the plain error standard, we conclude that defendant's right to a fair trial and due process have been infringed in a fundamental manner.

■■■■ It is constitutionally impermissible for the prosecutor or court to draw a negative inference from the defendant's election not to testify at trial. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, *reh'g denied*, 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965); *Cook v. State*, Del.Supr., 374 A.2d 264, 269 (1977) (citing *Griffin*). That is not to say that an accurate characterization of the evidence as uncontradicted is not permissible. *Lockett v. Ohio*, 438 U.S. 586, 595, 98 S.Ct. 2954, 2959–60, 57 L.Ed.2d 973, 983 (1978); *Hughes*, 437 A.2d at 573. Between these two extremes lies an uncertain area of latitude for comment on a defendant's failure to testify. The defendant suggests that we apply the test adopted by the Sixth Circuit to evaluate such remarks:

1) Were the comments 'manifestly intended' to reflect on the accused's silence *or* of such a character that the jury would 'naturally and necessarily' take them as such;

2) were the remarks isolated or extensive;

3) was the evidence of guilt otherwise overwhelming;

4) what curative instructions were given and when.

*Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988), *cert. denied*, 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989) (citations omitted). The State suggests that we adopt the test applied by a majority of jurisdictions, essentially the first prong of *Lent*'s four-part test. *See United States v. Flannigan*, 884 F.2d 945, 954 (7th Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3277, 111 L.Ed.2d 786 (1990).

■■■■ In conducting the plain error analysis, we are guided by *Hughes*, 437 A.2d at 559, where we set out a test to determine whether improper prosecutorial remarks prejudiced substantial rights of the accused:

> The decisive factors are the closeness of the case, the centrality of the issue affected by the [alleged] error, and the steps taken to mitigate the effects of the error.

437 A.2d at 571 (quoting *Dyson v. United States*, D.C.App., 418 A.2d 127, 132 (1980)). In determining whether error requiring reversal has occurred, it is crucial to find whether the defendant has actually been harmed by the State's response to defendant's constitutionally protected right not to testify. *Hooks v. State*, Del.Supr., 416 A.2d 189, 206 (1980); *State v. Yoder*, Del.Super., 541 A.2d 141, 142–43 (1987);

*United States ex rel. Macon v. Yeager,* 476 F.2d 613, 616 (3d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 154, 38 L.Ed.2d 104 (1973). Where references to defendant's silence are indirect, as in this case, we must examine the record to evaluate the impact on defendant's constitutional rights and to determine whether the impact on the trial's fairness is substantial or attenuated. *See Hooks,* 416 A.2d at 206. Thus, we examine the record to determine whether the prosecutorial remarks were improper and prejudicial. *Id.* at 207.

■ We first address whether the prosecutor's remarks rise to the level of a *Griffin* violation. Before reaching the question of whether a jury would naturally and necessarily take the comments as a reference to the defendant's failure to testify, we note the threshold requirements for a *Griffin* violation. The first requirement is that the comment or comments must be prejudicial; not every reference to an accused's right to remain silent mandates reversal. *Hughes,* 437 A.2d at 573–74; *Cook,* 374 A.2d at 269. Second, the comments, viewed against the record as a whole, must create an inference of guilt. *See United States v. Robinson,* 485 U.S. 25, 31–32, 108 S.Ct. 864, 868–69, 99 L.Ed.2d 23, 31 (1988) (prosecutor's statement that the defendant could have explained his story to the jury found not to be a *Griffin* violation when offered in response to defense counsel's assertion that the government had denied his client an opportunity to explain his actions); *Lockett,* 438 U.S. at 595, 98 S.Ct. at 2959–60, 57 L.Ed.2d at 983 (repeated State references to the evidence as "unrefuted" and "uncontradicted" found not to be a *Griffin* violation because defense counsel had promised the jury Lockett would be the "next witness").

■ Prosecutorial comments on a defendant's silence impinge on Fifth Amendment rights not to be compelled to be a witness against one's self when they are negative and uninvited and impermissibly create an inference of guilt. *See Robinson,* 485 U.S. at 31–32, 108 S.Ct. at 868–69, 99 L.Ed.2d at 31; *Hooks,* 416 A.2d at 206; *Cook,* 374 A.2d at 269. The State argues

that the prosecutor's comments were permissible to rebut defense counsel's speculations at trial as to alternate owners of the cocaine and aspersions on the thoroughness of the police investigation of the case. The record indicates that Robertson's counsel blamed the government for not calling the other young men present at the scene as witnesses, implying that the cocaine belonged to someone other than the defendant. However, counsel for defense did nothing to emphasize the lack of testimony by the defendant, or blame the government for the defendant's silence, as in *Robinson*. *Cf. Robinson,* 485 U.S. at 31–32, 108 S.Ct. at 868–69, 99 L.Ed.2d at 31.

In this case the prosecutor argued that "there's no evidence that came from this witness stand that those drugs were in the street before the defendant arrived. There's no evidence that came from the witness stand that those drugs came from [the other men present at the scene]." In our view, the prosecutor's remarks were both negative and uninvited. At the very least, the State implied that the defendant could have either denied any knowledge of the bag's existence or rebutted the trafficking charge by testifying that the cocaine was for his personal use rather than inventory for sale. The repetitive nature of the comments also precludes finding them to be a casual comment on the defendant's decision not to take the witness stand. Under the circumstances, the repeated references to the evidence being "undisputed from the witness stand" could only suggest to the jury that an inference of defendant's guilt should be drawn through his failure to testify. The prosecutor's remarks were clearly not "impartial and innocuous." *Cook,* 374 A.2d at 269.

We feel compelled to conclude that the jury would "naturally and necessarily" take the prosecutor's statements as a comment on the defendant's election to remain silent at trial. The prosecutor stated that if the drugs were possessed by defendant, there was "no testimony whatsoever that the drugs ... were possessed by him for his personal use." Only the defendant could have testified about his "personal use." This statement by the prosecutor

appears "manifestly intended" to reflect on defendant's silence. As noted, this remark was not isolated; the prosecutor repeatedly referred to the evidence as "not disputed."

The State also claimed there was "no evidence that came from the witness stand that those drugs came from [the defendant's passenger or the young man standing beside the Cadillac]." It is true that someone other than the defendant could have testified to ownership of the cocaine, but obviously no one would have an incentive to do so. Testimony by either of Robertson's two unidentified companions may have implicated them in the defendant's stead. *See Desmond v. United States,* 345 F.2d 225, 227 (1st Cir.1965) (prosecutorial characterization of evidence as "uncontradicted" impermissible where rebuttal must come from defendant or codefendant).

We find that the frequency of the improper remarks compels the conclusion that their purpose was to create an inference of guilt by focusing the jury's attention on defendant's failure to testify in support of his innocence. *See Yoder,* 541 A.2d at 144; *see also Lent,* 861 F.2d at 977. "[A]lthough individually, each comment may stem from a proper motive, in excessive cases, the sheer volume of such comments may warrant a finding of bad motive." *United States v. Griggs,* 735 F.2d 1318, 1324 n. 3 (11th Cir.1984). *See also Chapman v. California,* 386 U.S. 18, 26, 87 S.Ct. 824, 829, 17 L.Ed.2d 705, 711, *reh'g denied,* 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241 (1967) ("machine-gun repetition").

We finally evaluate whether Robertson was actually harmed by the indirect references to defendant's right not to testify. We note that the evidence offered against Robertson was not overwhelming. We therefore cannot conclude that the State's case against Robertson was so strong that we could find beyond a reasonable doubt that the constitutional error did not contribute to the conviction. *See Chapman v. California,* 386 U.S. at 23–26, 87 S.Ct. at 827–29, 17 L.Ed.2d at 710–11; *Claudio v. State,* Del.Supr., 585 A.2d 1278, 1302 (1991); U.S. Const. amend. V; Del. Const.

art. I, § 7; *see also Arizona v. Fulminante,* —— U.S. ——, 111 S.Ct. 1246, 113 L.Ed.2d 302, *reh'g denied,* —— U.S. ——, 111 S.Ct. 2067, 114 L.Ed.2d 472 (1991); *Yeager,* 476 F.2d at 616. The prosecutor's repeated characterization of the evidence as uncontradicted may well have influenced the jury to return a verdict of guilty.

The State suggests that the trial court's routine instruction cured any conceivable prejudice. We disagree. We find the extensive, repetitive references so "grossly prejudicial that the harm could not be removed by objections or instructions." *United States v. Harbin,* 601 F.2d 773, 776 n. 2 (5th Cir.), *cert. denied,* 444 U.S. 954, 100 S.Ct. 433, 62 L.Ed.2d 327 (1979) (quoting *Benham v. United States,* 215 F.2d 472, 473 (5th Cir.1954)). We therefore reverse all of Robertson's convictions for plain error and remand for a new trial.

\* \* \*

Reversed and Remanded.